# LACLEDE CONSTRUCTION COMPANY, Appellant, v. T. J. MOSS TIE COMPANY.

### Division Two, December 13, 1904.

1. **CONTRACT: Contemporaneous Conversations.** Parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument clear and certain in its meaning.

2. ———: ———: **Surrounding Circumstances.** A written contract should be read in the light of surrounding circumstances, in order the more perfectly to understand and explain the intent and meaning of the parties—not to contradict or vary it, but to ascertain the real meaning of the language used therein.

3. ———: ———: **As Needed: General Commercial Uses.** A dealer in railroad ties proposed by letter to the president of a named railroad company to "furnish you during the year 1899 all the white oak ties you may need to the number of one million or less, at forty-one cents each," etc., and the president replied that "the proposition to furnish this company white oak ties as needed during the year 1899 is hereby accepted." Prior to that the railroad company had in contemplation the construction of certain lines of road, and the president revealed that purpose to the manager of the tie company, and together they figured on the number of ties that would be needed, and the railroad president asked the manager to make a written proposal of the terms at which he would furnish them. The president testified that "that is all we bought ties for," and "that was the work we had in contemplation" when the proposal was made. No road was built. The contract was assigned to plaintiff which was really the *alter ego* of the railroad company, and plaintiff demanded the delivery of the ties in order that it might sell them to others, and the tie company refused to deliver them except when needed for constructing the lines of railroad in contemplation when the proposal was made. *Held*, first, that, unexplained by the parol evidence, this proposal and the answer mean that the tie company would furnish the railroad company ties as the railroad company might need them, in any amount not in excess of one million; and, second, when read in the light of the surrounding circumstances, they mean that the tie company agreed to sell ties to the railroad company as the railroad company needed them in the construction of its tracks; and, third, it was proper to permit the parol testimony to explain what ties were needed.

4. ———: ———: **The Words "You" and "May Need."** Where the proposal was to "furnish you all the white oak ties you may need" it is competent to ascertain by parol evidence who "you" was, and what ties were needed. Such proof does not infringe on the rule against allowing parol evidence to vary a written contract, but simply explains that contract.

5. ———: **Construction by Parties: Evidence.** The construction placed upon a contract by the parties at the time it was made or soon thereafter is strong evidence of its meaning. And a conversation between the parties when its meaning was under consideration is competent evidence to show their understanding of its meaning.

6. ———: ———: **Demand.** A demand for ties which were to be furnished as a railroad company needed them in constructing new lines of road, the demand being a request to furnish the ties for that purpose, if not made in good faith—if made, for instance, when no construction has been begun or is contemplated—does not place the tie contractor under any obligation to comply therewith.

Appeal from St. Louis City Circuit Court.—*Hon. Jno. A. Talty,* Judge.

AFFIRMED.

*Winston, Payne & Strawn* for appellant; *R. H. Kern* of counsel.

(1) If A is engaged in a business requiring the use of a certain commodity, and thereupon B agrees to sell and deliver to A for a price named all of such commodity "needed" by A during a certain period, and A accepts such proposition, a contract is thereby formed, which is not unilateral, but is binding upon both of the parties thereto. Laclede Const. Co. v. Tudor Iron Works (Mo.), 69 S. W. 389; Wells v. Alexandre, 130 N. Y. 642; Smith v. Morse, 20 La. 220; Manhattan Oil·Co. v. Richardson Lubricating Co. (C. C. A.), 113 Fed. 925; Nat. Furnace Co. v. Mfg. Co., 110 Ill. 433; Railroad v. Coal Co., 7 Weekly Law Bulletin 200; Cotton Oil Co. v. Kirk, 68 Fed. 793; Jones & Co. v. Binford, 74 Me. 442; Lewis v. Ins. Co., 61 Mo. 538; Mill Co. v. Goodnow, 42 N. W. 356. (2) If A offers to sell and deliver to B a fixed amount at a fixed price of

a certain commodity on or before a fixed date, such deliveries to be made from time to time as A may be notified by B to make such delivery, and afterwards and before the expiration of the time, or the withdrawal of the offer, B does notify A to make certain deliveries pursuant to terms of said offer, then that which had theretofore been merely a *nudum pactum,* becomes a complete and well-rounded contract. Laclede Const. Co. v. Tudor Iron Works, supra; Keller v. Ybarru, 3 Cal. 147; Lungstrass v. Ins. Co., 48 Mo. 204; Frue v. Houghton, 6 Col. 324; Mason v. Payne, 47 Mo. 520; Plumb v. Campbell, 129 Ill. 106; Railroad v. Graff, 27 Iowa 100. (3) When the terms of a written contract are clear and lucid it is a rule of law that parol evidence of an oral agreement or conversation had contemporaneously with or preceding or succeeding such written contract is not admissible to contradict, vary, add to or subtract from the terms of such contract. Bunce v. Beck, 43 Mo. 279; Tracy v. Union I. Wks. (Mo.), 16 S. W. 203; Scott v. Railroad (Va.), 19 S. E. 882; Reid v. Diamond Plate Glass Co., 85 Fed. 197; Bedford v. Flowers, 11 Humph. 242; Murdock v. Ganahl, 47 Mo. 137; Dean v. Mfg. Co., 58 N. E. 162; Hopkins v. Grocery Co., 66 S. W. 63; Norris v. Clarke (Minn.), 24 N. W. 128; Corse v. Peck (N. Y.), 7 N. E. 812; Burr v. Spencer, 26 Conn. 159, 68 Am. Dec. 379; McCormick v. Hughes, 66 Ill. 318. (4) Neither is parol evidence admissible, under such circumstances, to prove an intention or purpose not therein expressed or different from that to be derived from its terms. Miller v. Electric Lighting Co., 34 S. W. 589; Norris v. Clarke, supra; Hopkins v. Grocery Co., supra; Pike v. McIntosh (Mass.), 45 N. E. 749; Sargent v. Hutchings (Me.), 29 Atl. 926; Burr v. Spencer, supra; Watrous v. McKee, 54 Tex. 71; Bedford v. Flowers, supra. (5) If the language of a written contract is clear and lucid, courts will give effect to the intention of the parties only as that in-

tention appears from the contract itself. 1 Beach on
Contracts (Ed. 1896), secs. 703, 722; Clark v. Lillie, 39
Vt. 411; Smith v. Bank (Mass.), 50 N. E. 546; Milligan
v. Starr, 79 Ill. App. 443, affirmed 180 Ill. 459; Koeh-
ring v. Muemminghoff, 61 Mo. 403; County v. Wood,.
84 Mo. 515; Sarkben v. Wolfe, 61 Mo. App. 28.

*R. F. Walker* and *G. A. Finkelnburg* for respond-
ent.

(1) For the purpose of this appeal, all disputed
questions of fact and conflicts of testimony must be re-
solved in favor of respondent. The finding of the court
below having been in favor of the respondent on the
facts, as well as on the law, the only question here is
whether there was any competent evidence tending to
prove the facts maintained by the respondent. Hamil-
ton v. Boggess, 63 Mo. 251; Miller v. Breneke, 83 Mo.
165; Krider v. Milner, 99 Mo. 145; Skinker v. Haagsma,
99 Mo. 213; Handlan v. McManus, 100 Mo. 128; Irwin
v. Woodmansee, 104 Mo. 407; Bray v. Adams, 114 Mo.
486; Railroad v. News Co., 151 Mo. 398; Smith v.
Royse, 165 Mo. 658. (2) Letters passing between
parties, though resulting in a contract, do not con-
stitute a ''written contract'' within the meaning of
the rule excluding parol evidence intended to con-
tradict or vary written instruments. The rule in
question applies to documentary and more solemn
instruments, designed to be the repository and
evidence of the final intentions of the parties. 1
Greenleaf on Evidence (16 Ed.), sec. 275; Best on
Evidence (Am. Ed.), p. 229; Wald's Pollock on
Contracts, p. 457; Locket v. Nicklin, 19 L. J. Ex. 403;
Pac. Iron Works v. Newhall, 34 Conn. 67. (3) But
parol evidence is always admissible, even in the con-
struction of written contracts, to define the situation
and relation of the parties and all circumstances which
may explain the meaning of the language used; also

Laclede Construction Co. v. Moss Tie Co.

·oral statements made by the parties tending to show what was in their minds when the contract was made, and the sense in which the parties understood and used the terms expressed in the writing. Such evidence does not contradict or vary the terms of a written instrument, but serves to ascertain its true meaning. Irving Browne on Parol Evidence, sec. 54, p. 190, and ·sec. 53, p. 179; Stephens on Evidence (Chase's Ed.), p. 229; Benjamin on Sales, sec. 213 (Am. Ed), sec. 236; Williams v. Railroad, 153 Mo. 534; Blair v. Corby, 37 Mo. 313; Ellis v. Harrison, 104 Mo. 270; Calloway v. Henderson, 130 Mo. 87; Carter v. Foster, 145 Mo. 383; ·Granite Co. v. Milling Co., 78 Mo. App. 622; McDonald ·v. Longbottom, 1 Ellis & Ellis 977; Stoops v. Smith, 100 Mass. 367; St. Louis Ref. Co. v. Vinton, 79. Iowa ·239; Burditt v. Howe, 69 Vt. 563; Rogers v. Straub, 75 Hun 264; Lichtenstein v. Rubolinsky, 77 N. Y. Sup. 792; Lumber Co. v. Warner, 93 Mo..384; Lime Co. v. Metal Co., 77 Mo. App. 21; Kunz v. Temple, 48 Mo. 71; ·Schuetz v. Bailey, 40 Mo. 69; Hildebrandt v. Vogle, 20. Ohio 157; In re Curtis, 64 Conn. 514; Mead v. Parker, 115 Mass. 414; Balfour v. Fresno Canal, etc., 123 Cal. ·395; Leete v. Milling Co., 88 Fed. 957; Smith v. Bank, ·89 Fed. 832. (a) Even when the language used is ·unambiguous, evidence of prior negotiations may be introduced to assist in explaining the meaning of the words used in the contract. Williams v. Railroad, 153 Mo. 534; Rogers v. Straub, 75 Hun 264. (b) So, ·also, subsequent acts and declarations tending to show the construction put upon the contract by the parties themselves are always admissible. Ellis v. Harrison, ·104 Mo. 279; Brown v. Bowen, 90 Mo. 184; Wolfe v. Dyer, 95 Mo. 551; Union Depot Co. v. Railroad, 131 Mo. 305; Patterson v. Camden, 25 Mo. 21. (4) When ·a written instrument expressly refers to prior oral ·communications or verbal understandings, as is the ·case in the letters of October 31 and November 29, ·1898, evidence of what these conversations and verbal

understandings were is admissible on familiar principles, independent of the foregoing rules of evidence. They become part of the contract. (5) The testimony shows that the object and intent of the alleged contract failed—that the extensions of the Peoria Railroad, for which the ties were to be used, were never built, and that no ties were needed for that purpose. This relieved the Moss Tie Company from any obligation it had assumed under the alleged contract. (6) Where the promise in a contract is contingent or conditional, the promisor is discharged by the non-happening of the contingency or the failure to perform the condition. The existence of the contingency or condition may not only appear from the express terms of the contract, but they may also be implied from all the facts and circumstances surrounding the transaction. Preston v. Liverpool, Met. Rep., 5 H. L. Cases 605; Railroad v. Phillip, 2 McQueen, H. L. 514; Wood v. Railroad, 32 Ga. 272; Northam v. Gordon, 47 Cal. 582; Prest., etc., v. Henderson, 8 S. & R. 220; Hardwicke v. Pollock, 3 Pa. Dist. 245; Grant v. United States, 1 Ct. of Claims 61. (7) If appellant's construction of the alleged contract is correct, it is illegal and void. Appellant contends that this was an absolute undertaking to furnish ties whenever called for by appellant, without reference to whether they were needed for any special use or not. This would entitle appellant to call for ties if profitable and to call for none if unprofitable —a mere naked option—such a contract is unilateral, and void for want of mutuality and for want of consideration. Where mutual promises are relied on to support a contract, the obligations must be equally binding upon both parties; in addition to mutuality of promises, there must be reciprocity of obligation; otherwise they are void. Cooke v. Oxley, 3 Term Rep. (1790) 653; Railroad v. Dane, 43 N. Y. 240; Cotton Oil Co. v. Kirk, 68 Fed. 791; Bailey v. Austrian, 19 Minn. 535; Tarbox v. Gotzian, 20 Minn. 139; Stens-

gaard v. Smith, 43 Minn. 13; Hoffmann v. Maffioli, 80 N. W. 1032; Greene v. Iron Co., 88 Fed. 203; Ft. Scott v. Brokerage Co., 117 Fed. 58; Davis v. Petty, 147 Mo. 283; Hollman v. Conlon, 143 Mo. 378; Warren v. Costello, 109 Mo. 343; Steffen v. Railroad, 156 Mo. 322; Glass v. Rowe, 103 Mo. 539; Bailey v. Walker, 29 Mo. 407; Railroad v. Griffin, 96 Ga. 225; Morrow v. Express Co., 101 Ga. 810; Rafolovitz v. Tobacco Co., 25 N. Y. Supp. 1036; Campbell v. Lambert, 36 La. Ann. 35; Railroad v. Mitchell, 38 Tex. 85; Wilkinson v. Heavenrich, 58 Mich. 577; Crane v. Crane, 105 Fed. 869.

GANTT, P. J.—This is an appeal by the plaintiff in the above-entitled cause from a judgment of the circuit court of the city of St. Louis in favor of the defendant.

A jury was waived and the cause tried by the court. The petition alleges that the plaintiff is a corporation under the laws of Missouri for the purpose of building railroads and furnishing and laying ties thereon, and the defendant is a corporation under the laws of Missouri for the purpose of buying, selling and furnishing railroad ties. That on October 31, 1898, the defendant in writing, filed with the petition, sold and agreed to deliver to the St. Louis, Peoria and Northern Railway Company during the year 1899 all the white oak ties it might need to the number of one million or less at forty-one cents each free on board cars at the track of said railway company at East St. Louis, Illinois, or at Madison, Illinois, said ties to be of the standard size 6x8—8 feet long, and hewn of live sound white, burr or post oak. That between said October 31, 1898, and November 29, 1898, said St. Louis, Peoria and Northern Railway Company transferred said contract to plaintiff, and on said November 29, 1898, an agreement was entered into in writing, filed with the petition as a part thereof, whereby said

Laclede Construction Co. v. Moss Tie Co.

transfer was assented to by defendant, whereby it was agreed between plaintiff and defendant that defendant should sell and deliver to plaintiff during 1899 all the white oak ties plaintiff might need to the number of one million or less at forty-one cents each free on board the cars at the tracks of said St. Louis and Peoria Railway Company at East St. Louis or Madison, Illinois, said ties to be of standard size, 6x8—8 feet long and hewn of live sound white, burr or post oak, all said ties to be delivered to plaintiff on notice to defendant, as might be required by plaintiff during the year 1899; that on June 19, 1899, plaintiff was ready and willing and duly offered to receive at the track of said railway company in East St. Louis, Illinois, or Madison, Illinois, and to pay for the said million ties and in writing notified defendant to deliver said ties as rapidly as possible, having in view the delivery of the entire amount called for in the contract within the limit of time specified, to-wit, during the year 1899; that plaintiff duly performed all the conditions of the said agreement on its part, but defendant refused and failed to deliver said one million ties or any part thereof to plaintiff, to its damage in the sum of one hundred and seventy thousand dollars, for which, with interest from December 31, 1899, it prays judgment.

The exhibits to said petition are, respectively, in words and figures as follows, to-wit:

FIRST.

W. L. Huse, President.
J. W. Fristoe, Vice President
    and Gen'l Manager.
G. W. Hill, Treasurer.
Jas. W. Harrison, Secretary.

T. J. MOSS TIE CO.
Railroad Material
Office Rooms 720 and 721
Security Building.

St. Louis, Mo., October 31, 1898.

Mr. Wm. E. Guy, President St. L., P. & N. Ry., City.

Dear Sir:  Referring to your personal request for price on railroad ties.  We will furnish you during the year 1899 all the white oak ties you may need, to the number of one million, at forty-one (41) cents each, f. o. b. cars your track, East St. Louis, or Madison, Ill.  Ties to be of standard size, 6x8—8 ft. long, and hewn of live, sound, white, burr or post oak.

We shall be pleased to have your order. and know that we are in better position to furnish you first class material as and when you may need it, than any concern in the country.

Yours truly,

T. J. Moss Tie Co.

J. W. Fristoe, Mgr.


### SECOND.


### ST. LOUIS, PEORIA & NORTHERN R. R. CO.
President's Office.
Security Building.
William E. Guy, President and Gen'l Mgr.

St. Louis, Mo., Nov. 28, 1898.

Mr. J. W. Fristoe, Mgr. T. J. Moss Tie Co.

Dear Sir:—Your proposition of October 31st, to furnish this company white oak ties as needed during the year 1899 is hereby accepted.                          Yours very truly,

W. E. Guy,

Gen'l Mgr.


### THIRD.


### LACLEDE CONSTRUCTION COMPANY.
Security Building.

November 29th, 1898.

Mr. J. W. Fristoe, Manager T. J. Moss Tie Co., City.

Dear Sir:—As per verbal understanding of this day with yourself, the contract with the St. Louis, Peoria & Northern Railway Company for such ties as may be needed next year is transferred to and assumed by this company, with the additional provision that such second class ties as you may be able to furnish, and as may be required by us, shall be furnished to us at 9 cents less per tie than first class; and that all ties shall be delivered to us on notice to you as may be required by us during the year 1899.

Yours very truly,

W. E. Guy,

President.

Accepted Nov. 29th, 1898.          T. J. Moss Tie Co.

By J. W. Fristoe, V. P. Mgr.

The answer of defendant, omitting caption, is as follows:

"The defendant, for its amended answer, filed by leave of court, to plaintiff's petition in the above-entitled cause denies generally each and every allegation contained in said petition.

"And further answering, defendant says that the only transaction which occurred between defendant and the St. Louis, Peoria and Northern Railroad Company concerning the matters and things referred to in the petition was a conditional offer or proposal from this defendant to said railroad company to furnish not exceeding one million ties if needed by said railroad company for the construction of certain extensions of its line of railroad then contemplated by said railroad company, and as might be needed for that purpose during the year 1899, and for no other purpose whatever; that at the request of plaintiff and said railroad company said proposal was afterwards transferred to the Laclede Construction Company, the plaintiff in this suit, upon the express representation and assurance by plaintiff and by said railroad company that said construction company was specially organized to build the aforesaid extensions for said railroad company and for no other purpose, and that it would be more convenient to make payments for ties, if needed, through said construction company; but defendant says that said transfer was not intended and did not in any way alter or change the terms of said proposal to said railroad company as originally made.

"And defendant avers it to be a fact that the said construction company was organized for the sole purpose aforesaid and had no other object when said transfer was made, and that said transfer in no way changed the terms of the original offer or proposal, but that said proposal remained as theretofore, to-wit, a proposal to supply ties as needed for the uses for said St.

Louis, Peoria and Northern Railroad Company, for the extensions aforesaid.

"And defendant further states that after the proposal aforesaid had been made and transferred the St. Louis, Peoria and Northern Railroad Company abandoned its design to construct any extensions of its railroad, and the said railroad and the plaintiff so notified this defendant and informed defendant that the ties referred to in said offer or proposal would not be wanted, and thereby discharged this defendant from any obligation in the matter, if it ever incurred any, and the terms of said proposal were abandoned.

"And defendant avers that as a matter of fact said contemplated extensions of the St. Louis, Peoria and Northern Railroad Company were abandoned and have never been built or begun, and that no ties were ever needed or wanted for the purposes contemplated by said offer or proposal; but that plaintiff wrongfully seeking to take advantage of a rising market in ties now claims that this defendant was obliged to supply said plaintiff with one million ties at the rate of forty-one cents each for commercial speculation, and although such ties were not needed by said railroad company or by plaintiff for the use of said railroad company as contemplated by said offer or proposal.

"And defendant denies that it ever contracted to sell and deliver to said plaintiff during the year 1899, or at any time, all the white oak ties said plaintiff might need at the rate of forty-one cents a tie to the number of one million, as alleged in the petition, and denies that any ties were ever needed or could properly be demanded by plaintiff under the terms of said offer or proposal; and defendant further denies that plaintiff and said railroad company, or either of them, ever agreed to purchase or accept any ties from this defendant under the terms of said offer or proposal, and that hence there was no consideration for the alleged promise or agreement.

"And having fully answered defendant prays to be hence discharged with its costs."

There was a replication denying the allegations of the answer.

The evidence established the corporate existence and purposes of plaintiff as alleged. Plaintiff also offered and read in evidence the following letters from defendant to plaintiff and plaintiff to defendant.

Letter from the defendant to the plaintiff under date of October 31, 1898, offered in evidence by the plaintiff, as follows:

T. J. Moss Tie Co.
Railroad Material.
Office Rooms 720 and 721
Security Building.

W. L. Huse, President.                    J. W. Fristoe, Vice President
                                                            and Gen'l Manager.

St. Louis, October 31, 1898.

Wm. E. Guy, President, St. L., P. & N. Ry., City.

Dear Sir:—Referring to your personal request for price on railroad ties. We will furnish you during the year 1899 all the white oak ties you may need, to the number of one million or less, at forty-one (41) cents each f. o. b. cars your track, East St. Louis, or Madison, Ills. Ties to be standard size, 6x8—8 feet long, and hewn of live, sound white, burr or post oak.

We shall be pleased to have your order, and know that we are in a better position to furnish you first class material as and when you may need it, than any concern in the country.

Yours truly,
T. J. Moss Tie Co.
J. W. Fristoe, Mgr.

Letter dated November 29, 1898, from the plaintiff to the defendant, accepted by the defendant, as follows:

LACLEDE CONSTRUCTION COMPANY.
Security Building.

November, 29, 1898.

Mr. J. W. Fristoe, Manager, T. J. Moss Tie Co., City.

Dear Sir: As per verbal understanding of this date with yourself, the contract with the St. Louis, Peoria and Northern Railway Co. for such ties as may be needed next year is transferred to and assumed by this company, with the additional provision that such second class ties as you may be able to furnish, and as may be

required by us, shall be furnished to us at 9 cents less per tie than first class, and that all ties shall be delivered to us on notice to you as may be required by us during the year 1899.

Yours very truly,<br>Wm. E. Guy,<br>President.

Accepted, November 29th, 1898.      T. J. Moss Tie Co.,

By J. W. Fristoe, V. P. & Mgr.

A letter from the plaintiff to the defendant, under date of June 19, 1899, as plaintiff's Exhibit No. 4 as follows:

### LACLEDE CONSTRUCTION COMPANY.

St. Louis & Northern Short Line.
623 Security Building.

Wm. E. Guy, President, W. D. Taylor, Chief Engineer and Superintendent Construction.

St. Louis, Mo., June 19, 1899.

J. W. Fristoe, Esq., V. Prest. & Manager, T. J. Moss Tie Company, Security Building, St. Louis, Mo.

Dear Sir: Referring to the contract between your company and the Laclede Construction Company for one million oak ties. Will you please arrange to deliver these ties as rapidly as practicable, having in view the delivery of the entire amount called for in the contract within the limit as to time specified. Upon receipt of information from you as to the arrival of ties I will make arrangements with respect to inspection, etc.

Kindly acknowledge receipt.     Yous very truly,

J. N. Faithorn,<br>Vice President.

A letter from the plaintiff to the defendant, under date of June 27, 1899, offered in evidence, plaintiff's Exhibit No. 5, as follows:

Dear Sir: Referring to our letter of June 19th, will you kindly advise me in the premises, and also please notify me when we can reasonably look for a substantial number of those ties.

Yours very truly,<br>J. N. Faithorn.

Letter from the plaintiff to the defendant under date of July 5, 1899, plaintiff's Exhibit No. 6 as follows:

Laclede Construction Co. v. Moss Tie Co.

J. W. Fristoe, Esq., Security Building, St. Louis, Mo.

Dear Sir:—I would again call your attention to the fact that you have not yet favored me with a reply to my letter of June 19th last regarding delivery of ties to be furnished this company.

Will you please let me hear from you. ·

Yours very truly,

J. N. Faithorn,

Letter from the defendant to the plaintiff under date of July 6, 1899, as plaintiff's Exhibit No. 7, as follows:

St. Louis, July 6th, 1899.

Mr. J. N. Faithorn, Vice President, Security Building, City.

Dear Sir: With reference to your favors of June 19th and the 5th inst., we do not find that we are under contract to furnish you any railroad ties.     Yours truly,

T. J. Moss Tie Co.,

J. W. Fristoe.

Letter from the plaintiff to the defendant, under date of July 7, 1899, as plaintiff's Exhibit No. 8, as follows:

LACLEDE CONSTRUCTION COMPANY.

Building St. Louis and Northern Short Line.

623 Security Building.

Wm: E. Guy, President,

W. D. Taylor, Chief Eng. and Supt. Construction.

St. Louis, Mo., July 7th, 1899.

J. W. Fristoe, Esq., Vice President & Mgr. T. J. Moss Tie Company, Security Building, St. Louis, Mo.

Dear Sir:—I am in receipt this morning of your favor of the 6th inst., written in reply to my three communications of June 19th, 27th and July 5th, respectively. I note that you state in your letter as follows: 'We do not find that we are under contract to furnish you any railroad ties.' While it seems to me to be superfluous to do so, yet that there may be no misunderstanding I enclose you herewith copies of the documents in the possession of this company, which, to my mind, are reasonably plain and I would be glad to be advised, in order that it can be early determined what course to take, on what grounds your letter of July 6th was written in view of the existing contract, as per copies of papers enclosed. I would appreciate the favor of a prompt response.

Yours very truly,

J. N. Faithorn,

Vice President.

Letter from the defendant to the plaintiff, under date of July 8, 1899, as plaintiff's Exhibit No. 9, as follows:

W. L. Hulse, President.                    W. G. Hill, Treasurer.
J. W. Fristoe, Vice President              J. W. Harrison,
        and General Manager.                        Secretary.
                    T. J. Moss Tie Co.,
                    Railroad Material.
            Office Rooms 720 and 721 Security Building.

                            St. Louis, July 8th, 1899.
Mr. J. N. Faithorn, Vice President, Security Building, City.

Dear Sir:—Yours of the 7th inst., with enclosures, to hand. We have had no advice of your official connection with the Laclede Construction Company, and were not definitely aware of the fact that you referred to the contract of that concern, covered by our conversation and correspondence with Mr. Guy, president of that concern. The ties sold the Peoria and Northern Railroad, and which, by agreement with your Mr. Guy, were to be received and paid for by the Laclede Construction Company, were sold to be used exclusively for the proposed extension of the Peoria and Northern Railroad, to be made during the year 1899, and were not sold for any other purpose whatever. We stand ready to deliver such ties as may be needed for this purpose, but for no other purpose.

                            Yours truly,
                            T. J. Moss Tie Co.,
                            J. W. Fristoe, Manager.

Letter from the plaintiff to the defendant, under date of July 10, 1899, plaintiff's Exhibit No. 10, as follows:

                LACLEDE CONSTRUCTION COMPANY.

                Building St. Louis & Northern Short Line,
                        623 Security Building.
Wm. E. Guy, President.
W. D. Taylor, Chief Eng. and Supt. Construction.

                            St. Louis, Mo., July 10th, 1899.
J. W. Fristoe, Esq., Vice Prest. & Mgr., T. J. Moss Tie Company,
    Security Building, St. Louis Mo.

Dear Sir:—Replying to yours of the 8th instant concerning railroad ties. I beg to advise that your construction of the agreement is not correct. If you will notice the document dated November 29th, 1898, copy of which was furnished you with my letter of the 7th instant, you will find the following language: 'All ties shall be delivered to us on notice to you as may be required by us during the year 1899.' We need the entire one million first class ties and

hereby demand that you furnish the same within the time and in accordance with the terms of the contract. We need and desire the entire number as rapidly as it is possible for them to be delivered and I shall be pleased to be advised by you as promptly as possible when the first delivery may be expected and how soon you will be able to complete deliveries.

Yours truly,<br>
J. N. Faithorn,<br>
Vice President.

Letter from defendant to plaintiff, under date of July 13, 1899, plaintiff's Exhibit No. 11, as follows:

St. Louis, July 13, 1899.

Mr. J. N. Faithorn, Vice President, 623 Security Building, City.

Dear Sir:—Your favor of the 10th inst., to hand and noted. For answer to same please refer to our letter of the 8th inst.

Yours truly,<br>
T. J. Moss Tie Company.

By agreement, the closing paragraph of a notice from Messrs. Conklin & Grout, attorneys for the Laclede Construction Company, under date of July 24, 1899, to the defendant which is as follows:

By request of that company, we in their behalf hereby make formal demand on you, that you furnish the one million ties within the time specified in the contact. The company also hereby requests that you push delivery under the terms of the contract as fast as possible.          Yours very truly,

Conklin & Grout,<br>
Attorneys for the Laclede Construction Company.

Letter from the plaintiff to the defendant, under date of October 20, 1899, plaintiff's Exhibit No. 12, as follows:

Wm. E. Guy, President.

W. D. Taylor, Chief Engineer and Supt. Construction.

Messrs. T. J. Moss Tie Company, Security Building, City.

Dear Sirs—Some days since our company made demand on your company for twenty-five hundred railroad ties, which we desire to use at once on the line of the St. Louis, Peoria & Northern Railway and ask that you furnish them under the contract in existence for one million ties to be furnished during the year 1899 by your company. Your manager, Mr. Fristoe, in a conversation with Mr. A. Rumpler, of my office, I understand declines to furnish the ties.

Laclede Construction Co. v. Moss Tie Co.

That there may be no misunderstanding, this company now again makes formal demand for the delivery of twenty-five hundred ties at-once under the contract with this company.

Yours very truly,

J. N. Faithorn,
Vice President.

Letter from the defendant to the plaintiff, under date of October 30, 1899, plaintiff's Exhibit No. 13, as follows:

W. L. Huse, President.   G. W. Hill, Treasurer.
J. W. Fristoe, Vice President and   Jas. W. Harrison, Secretary.
Gen'l Manager.

T. J. Moss Tie Co.,
Railroad Material.
Office Rooms 720 and 721.
Security Building.

St. Louis, October 30, 1899.

Mr. J. N. Faithorn, Vice President, Laclede Construction Company, City.

Dear Sir:—With reference to yours of the 20th inst. Beg to say that if it is your construction of our contract with your company, covered by letters and conversation with your Mr. Wm. E. Guy, president, that we are bound to furnish only such ties as may be needed for the construction of bona fide extensions of the St. Louis Peoria & Northern Railway, we stand ready to deliver the twenty-five hundred ties called for in your favor above referred, to if they are to be used for that purpose. If, however, you still insist, as your letters have indicated, that we are under contract with your company to furnish you with one million ties during the year 1899, regardless of any extensions you may make, we must refuse to furnish you the twenty-five hundred ties above referred to.

Yours truly,

T. J. Moss Tie Co.,
J. W. Fristoe, Mgr.

Letter from the plaintiff to the defendant, under date of October 31, 1899, as plaintiff's Exhibit No. 14, as follows:

LACLEDE CONSTRUCTION COMPANY.

Building St. Louis & Northern Short Line,
623 Security Building.

Wm. E. Guy, President,
W. D. Taylor, Chief Eng. & Supt. Construction.

Laclede Construction Co. v. Moss Tie Co.

St. Louis, Mo., October 31st, 1899.

J. W. Fristoe, Esq., Vice President & General Manager T. J. Moss
Tie Company, Security Building, St. Louis, Mo.

Dear Sir:—Your favor dated the 30th instant reached me this
morning, in the matter of furnishing at this time certain 2,500 ties.
Of course, your letter can only be construed as a refusal to furnish
same, which I regret, as we certainly do not intend to in any way
waive our right to require the ties your company are obliged to
furnish.

Yours very truly,

J. N. Faithorn,
Vice President.

Plaintiff then proved by J. N. Faithorn that he was
the president of the Chicago Terminal & Transfer Rail-
way Company, and vice-president of the Laclede Con-
struction Company since June, 1899. He testified to his
signature to the various letters in evidence purporting
to have been signed by him; that he was largely en-
gaged in building railroads in 1899 and knew the cost
and market price of ties of the description mentioned
in the letters and they were worth 58 cents at Madison
or East St. Louis, Illinois; that they dropped 4 or 5
cents per tie late in the fall. On cross-examination Mr.
Faithorn stated he was not familiar with the affairs of
the St. Louis, Peoria and Northern Railroad prior to
his election about December 1, 1898; that Mr. Guy had
been his predecessor in that office; that a large number
of the stockholders lived in St. Louis, but the majority
elsewhere; that he understood there had been a change
in the ownership of the road; that he had not been
familiar with the affairs of the Laclede Construction
Company prior to his election as vice-president of it;
that he had seen the correspondence between the La-
clede Construction Company and the T. J. Moss Tie
Company prior to his becoming vice-president of the
Laclede Company; that there was a change of owner-
ship about May, 1899. He also testified, in substance,
that the proposed building of extensions of the St.
Louis, Peoria and Northern Railroad had been sus-
pended by Mr. Guy from May to June, 1899; that the

work on the two lines had never been resumed, nor the orders of President Guy countermanded; that no ties for either of these extensions of the St. Louis, Peoria and Northern had ever been called for under the T. J. Moss Tie contract sued on, up to the time Faithorn became vice-president of the Laclede Company.

Alfred Bennett testified ties of the character called for in the correspondence were worth 58 cents f. o. b. cars in East St. Louis or Madison.

On the part of defendant the testimony tended to prove that "in October, 1898, the St. Louis, Peoria & Northern Railway Company was an existing Illinois railroad corporation, owning and operating a railroad from East St. Louis to Springfield and Peoria, Illinois. It contemplated the building of important extensions in various directions and to various points, the principal ones being, Chicago, East Clinton, and Sparta, Illinois. In furtherance of this design Mr. William E. Guy, the president of the St. Louis, Peoria & Northern Railway, invited the T. J. Moss Tie Company to make a bid for the ties which might be needed for these extensions. Mr. Guy had a personal interview on the subject with Mr. J. W. Fristoe, manager of the Moss Tie Company. What transpired at this interview is stated by Mr. Fristoe, as follows:

" 'He (Mr. Guy) requested me to make him a price on the ties necessary to construct certain lines of road, which he outlined to me by naming the termini of the roads, the beginning and the end.

" 'Q. Now what were those lines of railway? A. One was a line which Mr. Guy told me he intended to build to a point opposite Clinton, Iowa, and East Clinton, Illinois; another line was to leave the then constructed line of the Peoria & Northern at a point near Peoria, New Holland, I believe, was the name of the point, and to build to Chicago, or a point somewhere near Chicago, though he said it was possible the line would not be built all the way to Chicago, but part of

the way, and running arrangements would be made with some railroad already built. He named a line to Sparta, Illinois, to Marion, Illinois, and he spoke of one or two other little cut-offs or lines that he intended to build, and gave me the mileage on the lines, the approximate mileage of the lines that he had named to me, and said that he would want the ties about two feet from center to center, and in figuring the number Mr. Guy took a pencil and paper and started to figure the number of ties for these lines; when he did so, he made a mistake in figuring, and I called his attention to the mistake; he only had some six hundred thousand ties for three hundred miles of railroad, and it requires twenty-six hundred and forty ties to a mile; that would make over eight hundred thousand ties. He threw the paper aside, and he said, "You write the proposition for the ties to build these lines."

" 'Q. Did you figure on the total that might be required? A. Yes, sir; the total that might be required, including side tracks in the yard.

" 'Q. Then you wrote that letter? A. Yes, sir.' '"

The letter referred to by Mr. Fristoe is as follows:

St. Louis, October 31, 1898.

Mr. Wm. E. Guy,

President St. L., P. & N. Ry., City.

Dear Sir:—Referring to your personal request for prices on railroad ties. We will furnish you during the year 1899 all the white oak ties you may need to the number of one million, or less, at forty-one (41) cents each, f. o. b. cars your track, East St. Louis, of Madison, Ills. Ties to be of standard size, 6x8—8 feet long, and hewn of live, sound white, burr or post oak.

We shall be pleased to have your order, and know that we are in a better position to furnish you first class material as and when you may need it, than any concern in the country.

Yours truly,

T. J. Moss Tie Co.,

J. W. Fristoe, Mgr.

On the 28th day of November, 1898, Mr. Guy on behalf of the railway company wrote the following letter to Mr. Fristoe:

ST. LOUIS, PEORIA & NORTHERN RAILWAY COMPANY.

President's Office.

Security Building.

Wm. E. Guy,
President and Gen'l Manager.

St. Louis, November 28, 1898.

Mr. J. W. Fristoe,
Manager T. J. Moss Tie Co., City.

Dear Sir:—Your proposition of October 31st to furnish this company white oak ties as needed during the year 1899 is hereby accepted.       Yours very truly,

Wm. E. Guy,
General Manager.

"On the next day, viz., November 29, 1898, Mr. Guy, president of the railway company, asked the Tie Company to consent to a transfer of the contract to the Laclede Construction Company. Mr. Fristoe testifies that in this conversation (which is referred to in the letter of November 29th, as a 'verbal understanding of this day') the president of the railway company stated the reasons and purpose of the transfer as follows:

" 'That the Laclede Construction Company has been organized to build these extensions that were mentioned in our previous conversation, and that the Laclede Construction Company would pay the bills as we furnished the ties, and it would be more convenient to put us in a condition to render the bills against the Laclede Construction Company, and to have a voucher that would cover their bills and prevent an interchange of vouchers and bills from one company to another, from the Laclede Construction Company to the Peoria Railroad Company.' "

Mr. Fristoe continues as follows:

" 'I answered I had no objection to transferring it.

" 'Q. As I understand you, he told you that the Laclede Construction Company had been organized for the specific purpose to build these same extensions which you have described before? A. Yes, sir.

" 'Q. Now, Mr. Fristoe, after that you received this letter—did you, which I have just handed you? A.

Yes, sir; I think I received the letter the same afternoon, or maybe, rather, after Mr. Guy had gone back to his office relative to this transfer.' ''

The letter referred to is as follows:

### LACLEDE CONSTRUCTION COMPANY.

Security Building.

St. Louis, Mo., November 29, 1898.

Mr. J. W. Fristoe,
  Manager T. J. Moss Tie Co., City.

Dear Sir:—As per verbal understanding of this day with yourself, the contract with the St. Louis, Peoria & Northern Railway Company for such ties as may be needed next year is transferred to and assumed by this company, with the additional provision that such second class ties as you may be able to furnish, and as may be required by us, shall be furnished to us at 9 cents less per tie than first class; and that all ties shall be delivered to us on notice to you as may be required by us during the year 1899.

Yours very truly,
Wm. E. Guy,
President.

Accepted Nov. 29, 1898.
  T. J. Moss Tie Co.,
    By J. W. Fristoe, V. P. and Mgr.

The testimony tends to show that at the time this letter of transfer was written the Laclede Construction Company had not only undertaken to build the contemplated extensions, but actually owned all the stock in the St. Louis, Peoria & Northern Railway Company, and had in fact been created as an intermediary for the purpose of a reorganization plan by which the St. Louis, Peoria & Northern Railway was to be merged into a new railroad corporation to be called the St. Louis & Northern Short Line, and which latter company was to carry out and operate the extensions heretofore referred to.

The true relation of the Laclede Construction Company to the St. Louis, Peoria & Northern Railroad and to the St. Louis & Northern Short Line appears from the testimony of William L. Huse, a stockholder in the

Laclede Construction Company and the Peoria Railway Company.

"Q. Now, what had the Laclede Construction Company to do, if anything, with this St. Louis, Peoria and Northern Railroad? A. The Laclede Construction Company was formed to build these extensions that I have spoken of; also to acquire the properties of the St. Louis, Peoria & Northern and the Madison Coal Company and other properties that they might own, and to turn them over to what was formed, the Northern Short Line, which was subscribed for in the fall of 1898, with a capital of about thirteen millions, to acquire these properties, eight millions of which was subscribed by Eastern capital. And the Laclede Construction Company had intended, as I say, to build the extensions to form this Northern Short Line, and to handle the properties and turn them over to the Northern Short Line, to be paid for with these thirteen millions as subscribed.

"Q. Now, was that plan carried out? A. Carried out so far as all the arrangements with the Northern Short Line, and forty per cent of the subscriptions were paid in, with the eight millions that were held in New York, of which they had drawn out five, and the committee controlling it decided that they wanted to sell to the C. & A. syndicate, and that brought a halt in the construction and in the carrying out of the plan further.

"Q. Now, was that sale made to the C. & A. people? A. It was.

"Q. And after that were those extensions built, or did operations cease upon these extensions? A. They had commenced the construction of the road from Peoria to East Clinton; surveys were made, right-of-way acquired, mostly, if not all, and possibly some grading done back of Peoria to get up on the hill there. When these negotiations for the sale to the C. & A. syndicate had progressed so far that the sale was

shortly to go through, or likely to go through, they stopped the operations on the road and ceased building and called off the workmen that were on the line.

"Q. Has work been resumed since that time? A. Not to my knowledge.

"Q. By the way, what was the holding of stock in the Peoria Railroad and the Laclede Construction Company relatively? Was there any relation between the two? A. Yes; the original Laclede Construction Company, which had charge of the arrangement, I think, in 1896, had a capital of $10,000. It was found that was inadequate to cover this large field that they proposed to do, and the capital stock was raised from $10,000 to $130,000 in the fall of 1898. I think in the month of October, or along about that time they increased the Laclede Construction Company so that their capital stock was just one per cent of thirteen millions, that, I say, was subscribed to form the Northern Short Line, of which five millions was paid up virtually by St. Louis capital, and eight millions of Eastern capital. It formed—that is to say, $130,000 is one per cent of thirteen millions. Then that stock in the Laclede Construction Company was allotted to the holders of the subscribers to this thirteen million syndicate, if you may call it so, that was to form the Northern Short Line, in the proportion of one per cent of their holdings in the thirteen million subscription; that would be their holdings that was allotted to them in the Laclede Construction Company.

"Q. Now, while you were interested in the Laclede Construction Company, did it ever do any business except that connected with this Peoria Railroad property? A. I never was a director of the Laclede Construction Company.

"Q. But you were a stockholder? A. I was a stockholder.

"Q. Were you familiar with what was going on? A. Quite so.

"Q. Well, now, state an answer to the question? A. The Laclede Construction Company, as I said before, was formed for the purpose of building the extensions that I have named, and was not intended as a general building scheme. You may say that they all had held in together; the interests were confined.

"Q. Well, did it do any business? A. No, sir.

"Q. Did it do any business of any other kind except that which was connected with the Peoria Railroad? A. It did not."

And from the testimony of George O. Carpenter, stockholder and director of the Laclede Construction Company:

"Q. Do you know that to be a fact, Mr. Carpenter, that the Laclede Construction Company was to build these extensions? A. Yes, sir.

"Q. What were those extensions? A. One was from near Peoria to Clinton, and the other was a branch to Chicago.

"Q. Is that all? A. I think there was a short branch contemplated at the southern end also.

"Q. What were these extensions of, of what railway? A. The St. Louis, Peoria & Northern.

"Q. Were they ever built? A. No, sir.

"Q. Did the Laclede Construction Company, while you were a member of the board of directors, acquire the stock of the Peoria Railroad? A. Of the Peoria Railroad?

"Q. The St. Louis, Peoria & Northern and the Madison Coal Company? A. Yes, sir.

"Q. Did the Laclede Construction Company, while you were a director, transfer the stock of the Peoria Railroad and of the Madison Coal Company, to the St. Louis and Northern Short Line? A. Yes, sir.

"Q. Was the Laclede Construction Company, while you were a member of the board, the instrument through which the reorganization was to take place

from the Peoria Railroad to the Northern Short Line?
A.   Yes, sir.''

On redirect examination Mr. Carpenter testified as
follows:

''Q.   You were asked whether you sold your stock,
and you said you did.   To whom did you sell?   A.
Why, I turned my stock over to Mr. West of the St.
Louis Trust Company; just who bought it I can't say.

''Q.   Well, the stock generally passed into the
hands of the Chicago & Alton?''

After discussion between counsel and court on ob-
jection to this question the witness answers as follows:

''A.   Yes, sir, that is my understanding.

''Q.   And you were paid, or were you paid in what
was called Chicago & Alton participation certificates?
A.   Yes, sir.''

Mr. I. W. Morton, in referring to the St. Louis,
Peoria & Northern Railroad Company and the Laclede
Construction Company, says:

''Q.   Were you familiar in a general way with
the affairs of the two companies?   A.   Well, in what
sense?

''Q.   In the sense of the relative position of the
two companies?   A.   I think I was, yes, sir.

''Q.   What was the relative position?   A.   The
Laclede Construction Company was formed for the
building and equipping of the road, and the handling
of its securities.

''Q.   What road?   A.   The Peoria and Northern
Road.   . . .

''Q.   What was the Laclede Construction Com-
pany to do with reference to those extensions?   A.
The Laclede Construction Company was for the pur-
pose of building the road, equipping it and handling
those securities.

''Q.   Now, Mr. Morton, while you were a director
in the Laclede Construction Company, did it enter into
any business transactions of any kind, except such as

were connected with the St. Louis & Peoria Railroad?
A.   It did not.   . . .

"Q.   To whom did you sell the stock?   A.   To the
Chicago & Alton syndicate.   . . .

"Q.   Was there any work done on those extensions
after the road passed into the control of the C. & A.?
A.   Not to my knowledge."

It appears from the testimony of Messrs. Huse,
Carpenter and Morton that the interests of the St.
Louis stockholders in these properties passed into the
hands of persons identified with the Chicago & Alton
Railroad Company, commonly called the C. & A. syn-
dicate.   As the C. & A. people were not interested in
constructing a competing line between St. Louis and
Chicago they abandoned all the proposed extensions
for the construction of which the tie contract had been
entered into.   On June 19, 1899, after all the extensions
had been abandoned, J. N. Faithorn, "vice-president,"
sent the following letter to the T. J. Moss Tie Company.

LACLEDE CONSTRUCTION COMPANY.

Building St. Louis and Northern Short Line,
623 Security Building.

Wm. E. Guy, President,
Wm. D. Taylor, Chief Engr. & Supt. Construction.

St. Louis, Mo., June 19, 1899.

J. W. Fristoe, Esq.,
    Vice Pres. and Manager T. J. Moss Tie Company, Security
Building, St. Louis, Mo.
    Dear Sir:—Referring to the contract between your company
and the Laclede Construction Company for one million oak ties.
Will you please arrange to deliver these ties as rapidly as practic-
able having in view the delivery of the entire amount called for in
the contract within the limit as to time specified.   Upon receipt of
information from you as to the arrival of ties I will make arrange-
ments with respect to inspection, etc.
    Kindly acknowledge receipt.
                              Yours very truly,
                                    J. N. Faithorn,
                                        Vice President.

The above letter not having been promptly answered, another letter of inquiry was sent, which finally resulted in the following reply:

St. Louis, July 8, 1899.

J. N. Faithorn, Vice-president,
   Security Building, City.

Dear Sir:—Yours of 7th inst., with enclosures, to hand.  We have had no advice of your official connection with the Laclede Construction Company, and were not definitely aware of the fact that you referred to the contract of that concern, covered by our conversation and correspondence with Mr. Guy, president of that concern.  The ties sold the Peoria & Northern Railroad, and which, by agreement with your Mr. Guy, were to be received and paid for by the Laclede Construction Company, were sold to be used exclusively for the proposed extension of the Peoria and Northern Railroad, to be made during the year of 1899, and were not sold for any other purpose whatever.  We stand ready to deliver such ties as may be needed for this purpose, but for no other purpose.

Yours truly,

T. J. Moss Tie Co.,

J. W. Fristoe, Mgr.

The foregoing letter contains defendant's construction of the agreement between the parties thereto, as it had been given to Mr. Guy before the road was sold to the C. & A. syndicate.  Mr. Faithorn, when asked why he called for a million ties, notwithstanding all work on the Peoria Railroad had been abandoned, answered as follows:

"I was in a position to dispose of those million ties in construction or renewal work, entirely to the satisfaction of the Laclede Construction Company.

"Q.  Now, to whom did you expect to dispose of those ties?  A.  The Chicago and Alton Railway."

The testimony further shows that in May, 1899, before the present controversy had arisen, Mr. Guy, then president of the Peoria Railway Company, as well as the Laclede Construction Company, called on Mr. Fristoe, of the T. J. Moss Tie Company, for 25,000 ties for the use of the Chicago Terminal Company; that Mr. Fristoe at once called Mr. Guy's attention to the fact that, under the contract, the Tie Company was not

obliged to furnish ties for any other use than the build-
ing of the contemplated extensions of the Peoria Rail-
road; that Mr. Guy acquiesced in the position taken by
Mr. Fristoe that these 25,000 ties, if furnished, should
be deducted from the amount of ties which might be
needed for the Peoria Railroad under the contract. Mr.
Fristoe explains it in the testimony as follows:

"Mr. Guy, along about April, 1899, came into my
office one day, and said he wanted us to deliver twenty-
five thousand ties to his company at East St. Louis.
'Now,' he said, 'I will be perfectly frank with you;
the ties are not wanted for the construction of the
Peoria & Northern Railroad, but are wanted for the
Chicago Terminal,' which, he said, was the Chicago end
of the new line he was going to build. I at once told
him no, we could not deliver the ties; our contract con-
templated the delivery of ties only to be used in the
construction of these new lines. Well, he said, that was
the view he had taken, naturally, but some of his people
thought we could be forced to deliver the ties regardless
of whether he built these lines. 'But,' he said, 'as a
special favor to me,' deliver these twenty-five thousand,
and he would loan them to the Chicago Terminal and
see that the Chicago Terminal returned them to his
company to be used in the building of these extensions,
and that in the end it would not be the means of us
furnishing any more ties than called for under this con-
tract, because the ties advanced would be returned. I
agreed that we would do that. But before the time
came for delivery to the Laclede Construction Com-
pany, the Peoria and Northern had been sold and fur-
ther extensions dropped. . . .

"Q. Now, when Mr. Guy called on you, was he
still connected with the Laclede Construction Com-
pany? A. Yes, sir; still president of it.

"Q. And he told you that he himself took that
view of the meaning of the contract? A. Yes, sir.

"Q. That it was a contract to furnish ties for a special purpose? A. Yes, sir."

Again, referring to the same subject, Mr. Fristoe testifies, as follows:

"When Mr. Guy asked for the twenty-five thousand ties, and told me they were going to the Chicago Terminal, he told me that whilst it was the opinion of some of his people with whom he was associated that we could be compelled to furnish those ties regardless of the purpose that they were to be put, he didn't propose it in that way; he wanted as an especial favor to him, that we furnish the twenty-five thousand ties for the use of the Chicago Terminal, and he would personally see that the twenty-five thousand ties were returned and used on the construction of those extensions, so in the end it would not be the means of us furnishing any more ties than were necessary."

Mr. Fristoe further testified that in the latter part of May, or the first part of June, 1899, after the sale to the C. & A. syndicate had been announced in the newspapers, he had a conversation with Mr. Guy, and that Mr. Guy then told him what the new owners intended to do. As this conversation is important we reproduce extracts from the testimony bearing on this point, as follows:

"Q. Well, now, did you have any subsequent conversation with Mr. Guy concerning the ties which you were to furnish while Mr. Guy was still president of the Laclede Construction Company? A. Yes, sir.

"Q. When was that? A. That was the latter part of May or the first of June, 1899.

"Q. What occurred then? A. Why, that was in the newspapers, where what was called the Chicago and Alton syndicate had purchased the Peoria and Northern Railway of the kindred companies, and that the construction of these new lines had been abandoned. I went to Mr. Guy and told him, and asked him if he would give me definite information as to which of his

lines were going to be built and which were going to be abandoned, giving him as a reason that in the event that he abandoned building these lines that we were going to have a number of ties on our hands for sale, and if they abandoned the lines I wanted to know, or wanted to sell my ties.''

Motion to strike out answer interposed and overruled.

''Witness: I have not finished yet.

''Counsel for plaintiff: That is a conversation with Mr. Guy as president of the Peoria Company.

''Counsel for defendant: Not at all; the president of the Laclede Construction Company.

''Witness (continuing): Because Mr. Guy at that conversation informed me he was still president of the Laclede Construction Company and he told me that the sale had taken place practically as the newspapers had it.

''Q. The sale of what? A. The sale of the Peoria & Northern, the Laclede Construction Company and Northern Short Line, and all these companies, they were considered practically as one.

''Q. They had been sold? A. Yes, sir, he made no special division of the companies, because they were understood practically to be one company.''

Motion to strike out last answer interposed and sustained.

''Q. Well, now then, what did he tell you? A. That the sale had taken place.''

Motion to strike out answer overruled.

''Witness: Practically as the newspapers had it, and that the line from New Holland, from near Peoria to Chicago, would not be built; but that was determined on—in fact, one of the prime objects of the sale or purchase was that he thought the line from Peoria to East Clinton would be built, and he was going to recommend it very strongly, and he thought it was possible that the line from Sparta down to Marion might be

built, but of that he was not sure, but that as far as ties were concerned, to build the line from New Holland to Chicago, we would not have them to furnish; but that we must hold ourselves in readiness to furnish the ties to build the other two lines, the line from Chicago to Peoria, the line from Sparta to Marion. The line first mentioned he was sure would be built, but he didn't think the line from Sparta would be."

Motion to strike out interposed and overruled.

"Q. Now were those lines which Mr. Guy mentioned to you at that time lines which he had mentioned to you before when he asked you to bid on the ties? A. Yes, sir; in fact, we had a number of conversations relative to those lines.

"Q. Please state those lines again. A. Those agreed upon were the Peoria and New Holland, I think is the place, to Chicago, or to some point near Chicago. As I understand, Mr. Guy told me that was not determined on definitely, but the line was definitely laid out from Peoria to East Clinton, or to a point opposite Clinton, Iowa. Now, the other one was the Sparta to Marion, and one or two other little cut-offs near about Marion, or about there.

"Q. Now, after that conversation, did you have any other conversation with Mr. Guy while he remained connected with the Laclede Construction Company? A. No, sir; I didn't see him.

"Q. Was that the last conversation you had with him? A. Yes, sir: I am not sure I didn't have a conversation with him whilst he was president after his return; I am not sure when he left the Laclede Construction Company.

"Q. But I understand you to say, Mr. Fristoe, that when the first request was made to you to make a bid on ties that the mileage was calculated? A. Yes, sir; it was calculated to figure which would practically be the mileage, I understood from Mr. Guy; he could not give me the definite or exact mileage at that time.

"Q. Was anything said by Mr. Guy in that first conversation as to where they intended to build those lines? A. Yes, sir.

"Q. What was said? A. Why, he intended to build them."

Objection interposed and not ruled on.

"Q. Was anything said in that first conversation as to what the ties were to be used for? A. Oh, yes, sir; they were to be used—"

Motion to strike out interposed and overruled.

"Witness (continuing): To be used to construct those lines mentioned.

"Q. Mr. Fristoe, were any of those lines built during the year 1899? A. No, sir.

"Q. Have any of those lines been built since 1899 up to the present time? A. No, sir."

Motion to strike out interposed and overruled.

Mr. Guy, one of plaintiff's principal witnesses, in referring to the first conversation between himself and Mr. Fristoe, the conversation in which the bid for ties was solicited, testified as follows:

"Q. But at all events, these extensions were mentioned as being the object of that bid? A. That was the work we had in contemplation.

"Q. And wasn't that the only object for which you invited a bid? A. That is all we bought the ties for.

"Q. You didn't want them for any general commercial purpose, but you wanted them to build railroads? A. We bought them for the work we had immediately in contemplation."

When asked as to the coversation with Mr. Fristoe concerning the request for 25,000 ties for the Chicago Terminal Company, he testified as follows:

"Q. Did he say to you that he would not deliver the ties, 'that our contract contemplated the delivery of ties only to be used in the construction of the com-

pany's lines of the Peoria & Northern Railway Company?' A.   I think he did.''

When asked whether he expressed his own view to the same effect in that interview, he answers:

''I don't recollect that.

''Q.   Did you state in any such language as that? A.   Not to my recollection.   As I say, I very probably may have said — the matter came up for discussion; there was some doubt on the point.

''Q.   There was some doubt? A.   Yes, sir.''

It appears from Mr. Guy's testimony that he was an officer in a number of corporations at the same time. and that he was a very busy man.

In corroboration of the testimony of Mr. Fristoe, Miss J. Fraser, a stenographer, testified that she was present when a conversation occurred between Mr. Guy and Mr. Fristoe, some time in March, 1899, at the latter's office; that Mr. Guy came to speak to Mr. Fristoe about getting 25,000 ties for the Chicago Terminal Railroad, of Chicago, and that Mr. Fristoe said that he could not furnish those ties on that contract that he had made with Mr. Guy for a million or less ties, and that Mr. Guy said that he wanted him to furnish those 25,000 ties, and that the Chicago Terminal would pay them back to him in the fall, and that would be 25,000 ties out of the million or less that they had contracted for.   She further testified that she was present when Mr. Guy came up in the fall of 1898 to make that contract for a million or less of ties for the extension of the St. Louis, Peoria and Northern Railroad; that she wasn't in the room all the time, but understood that was the contract; that was what she heard; that he came here to make a contract for a million ties or less for the Peoria & Northern Railroad; that was the conversation she heard.

A jury having been waived, the case was submitted to the court upon the evidence adduced.   And thereupon

the respective parties, through their attorneys, asked for the following declarations of law:

Plaintiff prayed the court to give the following declarations:

1. The court declares the law to be that there is no ambiguity in the contract between plaintiff and defendant requiring parol testimony to explain the same, and that the rights of plaintiff and defendant are fixed by such written contract.

2. The court declares the law to be, that the number of ties needed by plaintiff as mentioned in the contract between plaintiff and defendant was to be determined by plaintiff and not by defendant; nor by any other person, nor by any court, and that, if plaintiff advised defendant that it needed and would take the 1,000,000 ties during the year, then the number that defendant was bound to furnish was 1,000,000, and if defendant failed to deliver such ties, then it became liable to plaintiff in damages for such failure.

3. The court declares the law to be that if, before defendant had withdrawn its proposition in question, the plaintiff informed defendant that it would take the 1,000,000 ties described, then defendant was bound to furnish same, and its failure to do so made it liable in damages to plaintiff.

4. The court declares the law to be that the measure of damages in the case, if any, is the difference between the contract price and the market value of such ties at the point of delivery, and time of demand of such ties, with interest from December 31, 1899, at the rate of 6 per cent per annum.

5. The court declares the law to be that there was a valid subsisting contract between plaintiff and defendant, by which defendant bound itself to furnish to plaintiff, and plaintiff bound itself to receive from defendant, such ties of the description set forth in the contract as plaintiff should need for the purpose stated in

instruction numbered 3 given, during the year 1899, not exceeding 1,000,000 ties.

Defendant asked the court to give the following declarations of law:

1. The court declares that, under the pleadings and all the evidence in this case, plaintiff is not entitled to recover, and the judgment should be for the defendant.

2. If the court, sitting as a jury, believe from the evidence that the ties proposed to be furnished by the defendant during the year 1899, first to the St. Louis, Peoria & Northern Railway Company, and subsequently by transfer to plaintiff, meant and included only such ties as might be needed by plaintiff in making extensions for said railway company, and that no such extensions were made and that no act of the defendant prevented or contributed to prevent the making of such extensions, then no ties were needed by plaintiff within the meaning of the correspondence between plaintiff and defendant, and the judgment should be for the defendant.

3. If the court, sitting as a jury, finds from the evidence in this case that defendant's proposal to furnish ties, dated October 31, 1898, referred to such ties as the St. Louis, Peoria & Northern Railway Company might need during the year 1899 for the construction of certain extensions of said railway company's lines, then intended to be constructed by said St. Louis, Peoria & Northern Railway Company, and for no other purpose; and if the court further finds from the evidence that the construction of said contemplated extension was afterwards abandoned by said railway company and that no ties were, in fact, needed for that purpose, then defendant was not obliged to furnish any ties to said St. Louis, Peoria & Northern Railway Company under said proposal of October 31, 1898.

And if, in addition to the foregoing, the court further finds from the evidence that the said proposal was

transferred to the Laclede Construction Company for the purpose of enabling said construction company to construct said contemplated extensions of the St. Louis, Peoria & Northern Railway Company, and for no other purpose, then plaintiff can not recover in this action, and the verdict should be for the defendant.

4. In ascertaining the true meaning and effect of the proposal made by the T. J. Moss Tie Company to the St. Louis, Peoria & Northern Railway Company, and its subsequent transfer to the Laclede Construction Company, the court should determine what was the real intention of the parties at the time the transactions in controversy took place, in the light of all the evidence concerning the expressions used and the surrounding circumstances prevailing at the time, and also the subsequent conduct of the parties as showing their understanding of its terms.

The court gave all the declarations of law asked by defendant, and declarations numbered 4 and 5 asked by plaintiff, and refused to give declarations numbered 1, 2, and 3 asked by plaintiff.

I. The controversy in this case demands a construction and ascertainment of what in truth and in fact was the contract between the defendant and plaintiff as to furnishing railroad ties by defendant to plaintiff. Whatever that contract was, it must settle the respective rights of the parties to this action.

Both at common law and in this State it is the settled rule that when parties have put their engagements in writing, in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking were reduced to writing; and all oral testimony of previous colloquium between the parties or of conversations or declaration at the time when it was completed or afterwards, as it would tend in

many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly of one of the parties, is rejected. In other words, as the rule is now more briefly expressed, parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument. [Tracy v. Iron Works, 104 Mo. 193; 1 Greenleaf, Ev. (16 Ed.), sec. 275.]

Along with this general rule, however, a rule of interpretation is equally well settled, that the writing or contract should be read in the light of surrounding circumstances in order the more perfectly to understand and explain the intent and meaning of the parties. [Williams v. Railroad, 153 Mo. l. c. 534.] Thus, in Ellis v. Harrison, 104 Mo. l. c. 279, this court said: "The object of interpretation always is, or should be, to reach the actual intention of the parties. We mean, of course, that intention as expressed in the writing they employ to portray it, and consistent with the latter. When the subject-matter to which such a writing refers is not *entirely definite* and clear, it is permissible, and obviously just, to receive in evidence a description of the circumstances of its execution that the court may be placed, as near as may be, in the situation of the contracting parties with a view the better to adjudge in what sense the language used was probably intended by them. [Swett v. Shumway, 102 Mass. 365; Keller v. Webb, 125 Mass. 88.]" "Putting a construction upon a document means ascertaining the meaning of the signs or words made upon it, and their relation to facts. . . . In order to ascertain the relation of the words of a document to facts, every fact may be proved to which it refers, or may have been intended to refer, or which identifies any person or thing mentioned in it." [Stephen's Dig. Law of Evidence, art. 91, p. 108; Carter v. Foster, 145 Mo. 392.]

The foregoing excerpts sufficiently indicate the well-settled doctrine of this and other courts on the

admissibility of evidence to show the circumstances surrounding the parties at the time of entering into the contract.   Let us apply these principles to the contract in evidence in this case.   On October 31, 1898, Mr. Fristoe, the president of the T. J. Moss Tie Company wrote the following letter to Mr. William E. Guy, the president of the St. Louis, Peoria & Northern Railway Company:

"Dear Sir:   Referring to your personal request for price on railroad ties.   We will furnish you during the year 1899 all the white oak ties you *may need*, to the number of one million or less at forty-one cents each, f. o. b. cars your track, East St. Louis or Madison, Illinois.   Ties to be of standard size 6x8—8 feet long, and hewn of live, sound white, burr or post oak.   We shall be pleased to have your order and know we are in a better position to furnish you first-class material as and when you may need it, than any other concern in the country.            Yours truly,   .

"T. J. Moss Tie Co.,

"J. W. Fristoe, Manager."

On the 28th of November, 1898, Mr. Guy, on behalf of said railway company, wrote Mr. Fristoe the following letter:

"St. Louis, Peoria and Northern Railway Co.,
                President's Office.
                Security Building.
"Wm. E. Guy,
        "President and General Manager,
                "St. Louis, Mo., November 28, 1898.
"Mr. J. W. Fristoe,
        "Manager T. J. Moss Tie Co., City.
        "Dear Sir:   Your proposition of October 31st to furnish *this company* white oak *ties as needed* during the year 1899 is hereby accepted.
                "Yours very truly,
                        "Wm. E. Guy,
                        "General Manager."

A careful reading of this correspondence will show that this was a proposition on the part of the tie company to furnish the St. Louis, Peoria & Northern Railway Company railroad ties to the amount of one million or less in 1899, which the *said railroad company* might *need*. It will be noted it was not an offer to furnish one million ties absolutely, no more and no less for so much per tie, but ties to the number of one million, or a less number, as that railroad company might *need* more or less.

We think that in the absence of any other light there is little room for controversy that this is the true meaning of the offer, and this is accentuated by the acceptance of the president, Mr. Guy, wherein he says, "Your proposition of October 31st, to furnish *this company* white oak ties *as needed* during the year 1899, is hereby accepted." The ties then were to be furnished a *certain railroad company* as that company might *need* them. Now under what circumstances was this offer and acceptance made? The evidence of both Fristoe and Guy shows beyond all doubt that Mr. Guy had on the 31st of October, 1898, *requested* Fristoe to make him a price on ties *necessary* to construct certain lines of railroad which he outlined to Fristoe; to-wit, one to Clinton, Iowa, and East Clinton, Illinois; another to leave the St. Louis, Peoria & Northern as then constructed at a point near Peoria, New Holland, and to extend to Chicago or near that city; and another to Sparta or Marion, Illinois, and one or two other short cut-offs, and gave Fristoe the mileage of these proposed extensions and said he would want the ties about two feet from center to center. Having given the miles he intended to build he began figuring on the number of ties that would be needed for said extensions and Mr. Fristoe called his attention to a mistake in his estimate, whereupon Guy said to Fristoe, "*You write the proposition for the ties to build these lines,*" and thereupon Fristoe wrote the offer in the letter of October 31st.

While Mr. Guy does not agree to all Mr. Fristoe says as to this conversation, he was asked, "But at all events these extensions were mentioned as being the object of that bid?" and he answered, "That was the work we had in contemplation." Q. "And wasn't that the only object for which you invited a bid?" And he answered, "*That is all we bought the ties for.*" Q. "You didn't want them for any general commercial purpose, but you wanted them to build railroads?" A. "We bought them for the work *we had immediately* in contemplation."

It was conceded on all sides that neither of these proposed roads was ever built. In the light of these circumstances surrounding the contracting parties is it not evident that the meaning of the expressions, all the ties "*you may need,*" "*as and when you may need it,*" "*as needed,*" and "*as may be needed next year,*" have reference to the necessities of this railroad, and the question arises, can the evidence be heard to show the works for which they were to be needed without in any manner contradicting or varying the contract between these parties? As already said, the offer was to furnish "*you.*" Now there can not be the least doubt that it was and is competent to show who was meant by "*you*" in this offer, even if it had not been definitely fixed by Mr. Guy's acceptance to mean "*this company,*" viz., the St. Louis, Peoria & Northern Railway Company. Stephen on Evidence, art. 91, p. 10, states the doctrine to be that, "In order to ascertain the relation of the words of the document to the facts, every fact may be proved to which it refers, or may probably have been intended to refer, or which identifies any *person* or thing mentioned in it," and this was approved by this court in Calloway v. Henderson, 130 Mo. 77-87, and the court adding, "The proof of the facts to which the document refers does not violate the other necessary and important rule forbidding the in-

troduction of parol evidence to vary, limit or contradict the written instrument.''

We ascertain then *to whom* the Tie Company agreed to furnish the ties by reference to all.the correspondence, and by proof *aliunde,* whom Mr. Guy was representing, to-wit, the St. Louis, Peoria & Northern Railway Company. This proof in no manner contradicted the writings, but simply explained it so that it could be intelligently applied to the facts. Proceeding a step further then: Was it an infringement of the rule against allowing parol evidence to vary a written contract to permit defendant to go further and to show what subject-matter the terms, ''the ties *you may need,*'' and, ''*as and when you may need them,*'' and, ''*as needed,*'' were intended to be applied? We have seen that these expressions referred to the needs of the St. Louis, Peoria & Northern Railway Company. That was the person or company who would *need* the ties, and the contract on its face shows the ties were to be furnished that company *only* as it *needed them.*

The evidence went to the extent only of showing for what purposes the ties were to be needed, to-wit, certain then contemplated extensions and railroads to be built by said railroad company which were made known to defendant at the time, and the amount of mileage it proposed to construct. The offer opens with a reference to a ''personal request'' by Mr. Guy of Mr. Fristoe for prices on ties and offers to furnish the ties ''needed.'' ''Needed'' for what? The evidence admitted answers that question: ties for the extensions which Mr. Guy had told Mr. Fristoe the St. Louis, Peoria & Northern Railway Company proposed to build, and on which they had made an estimate, and for which alone Mr. Guy desired to purchase ties.

It is earnestly insisted, however, that by permitting the evidence of Mr. Fristoe as to the circumstances in which he was induced to make the offer to furnish the *necessary* ties for the St. Louis, Peoria & Northern

Laclede Construction Co. v. Moss Tie Co.

Railway Company for the year 1899 and the extensions
for which Mr. Guy assured him he wanted the ties, the
court thereby *changed* the contract which the parties
actually made as evidenced by their correspondence.
If this is true, it was error to admit it. If, however,
it only explained and made clear that which was in-
definitely stated in the contract, we think it was not
error. Without going over the learning with which
the books are full as to latent and patent ambiguities,
we think the law, as already stated in general terms,
permits the proof of the attendant circumstances sur-
rounding the parties when the contract was made to
explain the subject-matter of a contract when the lan-
guage used admits of different interpretations accord-
ing to the subject-matter in contemplation at the time.

Language after all is but the medium through which
we communicate our agreements with each other and
too often fails for want of care in the use of our words
to express just what and all that we mean. Of course,
when it is plain, certain and definite, there is no room
for interpretation and the words used in their usual
and ordinary acceptation must control, but where a
word or words used are not definite, but are susceptible
of different meanings according to the subject-matter
about which they are used, it is no violation of the
rule excluding parol evidence to admit parol evidence
to show the subject-matter which the parties had in
view in making the contracts. Judge STORY, in Peisch
v. Dickson, 1 Mason 11, considered those cases in
which words are equivocal, but yet admit of precise and
definite application by resorting to the circumstances
under which the instrument was made in which cases
parol evidence he held was admissible. As an example,
he put the case of a party assigning his freight in a
particular ship by contract in writing, saying, parol
evidence of the circumstances attending the transaction
would be admissible to ascertain whether the word
*"freight"* referred to the goods on board of the ship,

or an interest in the earnings of the ship. "This distinction," says the Supreme Court of Wisconsin, in Ganson v. Madigan, 15 Wis. 153-4, "seems to be fully sustained by the later authorities, and we can discover no objection to it on principle." [Citing Hall v. Davis, 36 N. H. 569; Emery v. Webster, 42 Maine 204; Drake v. Goree, 22 Ala. 409; Cowles v. Garrett, 30 Ala. 348; Waterman v. Johnson, 13 Pick. 261; Mechanics' Bank v. Bank of Columbia, 5 Wheat. 326; 1 Greenleaf Ev., secs. 286-7-8.]

Chief Justice DIXON, after citing these cases, proceeds to say: "If evidence of surrounding facts and circumstances is admitted to explain the sense in which the words were used, certainly proof of the declarations of the parties, made at the time of their understanding of them, ought not to be excluded. Such declarations, if satisfactorily established, would seem to be stronger and more conclusive evidence of the intention of the parties than proof of facts and circumstances, since they come more nearly to direct evidence than any to be obtained, whilst the other is but circumstantial." Accordingly, in that case, the action of the circuit court in admitting evidence by the defendant of the meaning put upon the words "*a good team*," in a contract containing a warranty that a certain machine should be capable with one man and *a good team* "of cutting and raking off twelve to twenty acres of grain a day," was sustained. The court said: "The word 'team', as used in the contract, is of doubtful signification. It may mean horses, mules, or oxen, and two, four, six or even more of either kind of beasts. And yet we know very well that the parties had some definite purpose in using the word. The trouble is not that the word is insensible, and has no settled meaning, but that it at the same time admits of several interpretations, according to the subject-matter in contemplation at the time. It is an uncertainty arising from the indefinite and equivocal meaning of the word, when an in-

terpretation is attempted without the aid of surrounding circumstances." In that case it was earnestly insisted it meant any team that was necessary to pull the machine, whereas the proof admitted showed the reference was to a team of two horses only.

Now, the words "the ties you may need" during 1899 or "ties as needed," while plain words, are susceptible of various meanings accordingly as the context in which they appear may throw light upon them or the subject-matter with respect to which they are used. We instinctively ask, "needed" for what? Merely for repairs of the railway then constructed, or "needed" for new extensions which were made known to defendant when it contracted to furnish them, or "needed" in the sense of all ties to the number of one million that the plaintiff might elect to purchase for *general commercial purposes?* We think clearly it was competent to show the circumstances in which the contract was made and the declarations of plaintiff's president as to the purposes for which he would need them.

A familiar case on this subject is McDonald v. Longbottom, 1 Ellis and Ellis (E. C. L.) 977, in which the defendant by written contract had contracted to purchase of the plaintiffs who were farmers, "your wool." Lord Chief Justice CAMPBELL said: "The only question therefore is what was the subject-matter of the contract described as 'your wool.' I am of the opinion that where there is a contract for the sale of a specific subject-matter evidence may be received for the purpose of showing what the subject-matter was, of every fact within the knowledge of the parties before and at the time of the contract. Now, Stewart, defendant's agent, had a conversation before the contract with one of the plaintiffs who stated what wool he had on his own farm and what he had bought from other farmers. The two together constituted *his* wool; and with the knowledge of these facts, the de-

fendant contracts to buy '*your wool.*' There can not be the slightest objection to the admission of evidence of this previous conversation which neither alters nor adds to the written contract, but merely enables us to ascertain what was the subject-matter referred to therein.''

To the same effect were the concurring opinions on this point.

On the principles announced in these cases we think the evidence as to the purposes for which the ties were or would be *needed* was admissible.

Interpreted in this way and by means of the light thrown on the language used, we understand fully to what the contract referred and what both parties intended by the offer and acceptance.

The proof of these facts did not vary the contract or contradict the writing, but makes clear the purpose in the mind of both the contracting parties, to-wit, an agreement on the part of the tie company to supply ties sufficient, not to exceed one million, during the year 1899 that might be needed for the construction of the St. Louis, Peoria & Northern Railway Company's proposed new lines and extensions, which had been unfolded by Mr. Guy to Mr. Fristoe and which Mr. Guy had requested Mr. Fristoe to supply said company for said purpose.

With this construction placed upon the correspondence the agreement was mutually binding upon both parties and after the acceptance by Mr. Guy the St. Louis, Peoria & Northern Railway was obligated to purchase, not a million of ties for general commercial purposes, but such, and in number only, as it should *need* for the new roads it should build and extensions made to its already completed road during the year 1899. But if it did not build said new roads or extensions, the tie company was not bound to furnish it any ties, nor was it bound to accept any ties unless it actually constructed such extensions and

*needed the ties* therefor. Nor was it bound, at all events, to take a million ties, but only such as it needed for that purpose, or at the utmost that the said St. Louis, Peoria & Northern *needed*. Nor is it true that the said railway was the sole judge of whether it *needed* the ties under this view of the contract, but if it constructed the proposed roads it was bound to take the necessary ties from the tie company, not it is true the whole million, but such and such only as were necessary for such new extensions and roads as it should build during 1899, and this would have been a question of fact as to how many ties were needed for such extensions as it should build. Obviously it is one contract to furnish ties for a contemplated railroad yet to be begun and built *"as and when needed"* or *"needed"* for that purpose, and an entirely different one to furnish a million of ties during 1899 without any reference to the purpose for which they are to be used and upon a demand to furnish the whole million from June 19, 1899, to December 31, 1899, inclusive, as *rapidly* as *practicable* so as to deliver the whole within the time limited.

It is within common experience that a tie contractor keeping himself advised of the purposes of the construction of a new road might easily be prepared to furnish and might furnish the *ties* as *needed* for such a purpose without difficulty, whereas it might entail ruin on him if under such an agreement the railway company should elect to construe such a contract to mean that it need not build any such new road or extensions at all, but elect to wait until the very last days of the time within which the ties must be delivered and demand the whole number at once for purely commercial purposes, as plaintiff did in this case, to sell to other railroads or persons without any reference to its *needs* for them.

That neither party so construed the offer and acceptance at the time they were made, we think is ab-

solutely clear, not only from the language of the offer of acceptance, but from the circumstances and statements attending the making of the offer, and from the testimony of the president, Mr. Guy, and Mr. Fristoe. Mr. Guy stated substantially that the purpose of buying the ties was for the work *"we had immediately in contemplation;"* *"that is all we bought them for."* But this is not all. We think this is made clear from the practical construction mutually placed upon the agreement by both parties.

In April, 1899, before this controversy had arisen and before the change in the ownership of the railroad and of the Laclede Construction Company, Mr. Guy, then president of both the St. Louis, Northern & Peoria Railway Company and the Laclede Construction Company, called on Mr. Fristoe for 25,000 ties for the use of the Chicago Terminal Company, and Mr. Fristoe at once notified him that their contract did not bind the tie company to furnish ties for any other use than for the building of the contemplated extensions of the Peoria Railroad. On this point Mr. Fristoe was positive and Mr. Guy says he thinks Mr. Fristoe took that position, but he did not recollect that he said to Mr. Fristoe, "I will be perfectly frank with you; the ties are not wanted for the construction of the Peoria & Northern Railway, but are wanted for the Chicago Terminal." To which, Mr. Fristoe says, "I at once told him no, we could not deliver the ties; our contract contemplated the delivery of ties only to be used in the construction of these new lines." "Well, he said that was the view he had taken, naturally, but some of his people thought we could be forced to deliver the ties regardless of whether he built the lines." "But as a special favor to me, deliver these 25,000 ties and he would loan them to the Chicago Terminal and see that the Chicago Terminal returns them to this company to be used in the building of the extensions." To which Mr. Fristoe agreed, but, before they were de-

livered, the railroad was sold and they were never de-livered.

Now, while Mr. Guy says he does not recollect that he expressed the same view as to the meaning of the contract that Mr. Fristoe did, he does remember Mr. Fristoe's claim at the time, and says, "I very prob-ably may have said—the matter came up for discus-sion; there was some doubt on that point."

Miss Fraser corroborates Mr. Fristoe as to his version of this conversation. In addition to this it is established that no such extensions were built and no demand for ties was ever made while Mr. Guy con-tinued in charge of the railroad and of the construction company, and not until June 19, 1899, was any demand made, and that was by Mr. Faithorn for the Laclede Construction Company.

That these subsequent acts and declarations tend-ing to show the construction put upon this contract by the parties themselves were competent we think there can be no doubt. This court had adopted the language of Lord SUGDEN in Attorney-General ex rel. v. Drum-mond, 1 Dru. & War. 368: "Tell me what you have done under a deed, and I will tell you what that deed means." Another way of expressing the doctrine that the practical construction placed upon any instrument by both parties thereto is strong evidence of what they both intended it to mean.

Our conclusion is that the proper construction to be placed upon the original offer and acceptance for the furnishing of the ties is that it was a contract by which the T. J. Moss Tie Company was required to furnish the St. Louis, Peoria & Northern Railway Com-pany ties as might be needed by said railroad com-pany in making the proposed extensions of said rail-way, and was not a simple unconditional contract to furnish a million ties for 41 cents each during the year 1899, and that as no such extensions were made and no act of defendant contributed to prevent the making of

the same, said ties were not needed within the fair construction of the contract, and defendant was not in default in not furnishing the same under said original agreement evidenced by the offer of October 31st and the acceptance of November 29th, 1899.

We come next to inquire what effect the transfer of this contract to the Laclede Construction Company had upon the respective rights of the parties. Did it enlarge and change the obligation of defendant? The written memorandum as to this transfer is found in a letter from Mr. Wm. E. Guy, president of the Laclede Construction Company, of date November 29, 1898, as follows:

"Mr. J. W. Fristoe,

   Manager T. J. Moss Tie Company,

      City,

"Dear Sir—

"As *per verbal understanding* of *this* day *with yourself,* the contract with the St. Louis, Peoria & Northern Railway Company for such ties as *may be needed* next year, is transferred to and assumed by this company, with the additional provision that such second class ties as you may be able to furnish and as may be required by us, shall be furnished to us at 9 cents less per tie than first class; and that all ties shall be delivered to us on notice to you as may be required by us during the year 1899.

                  "Yours very truly,

                     "Wm. E. Guy, President."

"Accepted November 29th, 1898,

     "T. J. Moss Tie Company,

        by J. W. Fristoe,

           "Vice President & Gen'l. Mgr."

By this transfer it is too plain for controversy that the Laclede Construction Company acquired the same rights under the contract previously made between the railroad company and the tie company, that the railroad company had, no more and no less.

As to the new provision in regard to second class ties there is no controversy, and it may be left out of view in the disposition of this question. By this letter "the contract with the St. Louis, Peoria & Northern Railway Company for such ties as may be *needed* next year is transferred to and assumed by this company," to-wit, the Laclede Construction Company. What contract? Obviously we are driven to the *verbal understanding* with Mr. Fristoe of that date. Referring then to that *verbal understanding* to eke out the contract referred to in the writing we find that on the 29th of November, 1898, after the making of the contract with the T. J. Moss Tie Company, Mr. Guy, president of both the railway company and the Laclede Construction Company, asked Mr. Fristoe verbally to consent to a transfer of the contract with the tie company to the Laclede Construction Company, giving as a reason therefor "that the Laclede Construction Company had been organized to build these extensions and would pay the bills as we furnished the ties and it would be much more convenient to put us in a condition to render the bills against the Laclede Construction Company and to have a voucher that would cover their bills and prevent an interchange of vouchers from one company to another." Mr. Fristoe acceded to this.

As a matter of fact there was evidence sufficient for the court to find that, at that time, the Laclede Construction Company had been formed to build these very extensions and had acquired and controlled all the stock of the St. Louis, Peoria & Northern Railway Company and the Madison Coal Company. The proofs established that the Laclede Construction Company was but another name for the St. Louis, Peoria & Northern Railway Company, and actually owned all the stock of said company, and had been created as an intermediary for the purpose of a reorganization by which the St. Louis, Peoria & Northern was to be merged in a new company to be called the St. Louis &

Northern Short Line, which latter company was to carry out and operate the proposed extensions. So far as the defendant was concerned under the evidence in this case it was obligated to the same party under a different name and a company organized for the purpose of building the same extensions and owned by the same persons, but if it had been an independent company the transfer did not change the obligation of defendant. It was still bound only to furnish ties that the St. Louis, Peoria and Northern Railway Company might need, whether it did the work itself or let it to another to be done for it. The language of the transfer is, "The contract with the St. Louis, Peoria & Northern Railway Company for such ties as may be needed next year is transferred to and assumed by this company." No new contract was intended, but a transfer of the contract already made, the only change being in the party who assumed to pay for the same ties to be furnished for the same purpose, that is, needed for the same extensions, which were the sole object and purpose of the contract.

There is nothing in the original contract or the assignment thereof that shows the contract was for a million of ties to be delivered at a certain time or place absolutely, neither was it an option on a million ties to be delivered if *called for*. The language of the contract is such ties as *you* (the St. Louis, Peoria & Northern Railway Company) may *need,* and the assignment nowhere attempts to change this material part of the contract, but confirms it in express terms. Under the assignment the tie company was bound to deliver such ties as may be needed by the Laclede Construction Company to carry out the proposed extensions of the St. Louis, Peoria & Northern.

Counsel for plaintiff say: "The appellant does not insist that the Laclede Construction Company could have compelled the tie company to furnish ties to every railroad in the country regardless of whether

the Laclede Construction Company had a contract with that railroad company to furnish it ties or to do work for it which necessitated its use, for ties;'' and yet this is just what the plaintiff's own vice-president, Mr. Faithorn, practically says he wanted with the ties, viz, to sell to the Chicago & Alton Railway. It is abundantly shown that the Laclede Construction Company had never done any construction work for any other railroad than the St. Louis, Peoria & Northern, and that it was organized to build these extensions for that company alone.

We can reach no other conclusion than that this contract by its terms was limited to furnishing ties to the Peoria Company or its construction company, employed to build the extensions, which it might *need* for that purpose. There was not the slightest evidence that such ties were needed either for the main line or either of the proposed extensions. The extensions were never built, and Mr. Fristoe was notified by Mr. Guy that the contemplated extension to Chicago would not be built and the ties for that would not be needed; that the line to Sparta might be built, but he was not sure of it, but he thought the line from Peoria to Clinton would be built, so that the tie company would have to hold itself in readiness to furnish the ties to build the two lines, but in fact they were never built. It is true Mr. Guy says he can not recall any such conversation, but this presents only a conflict in testimony, and the circuit court evidently thought Mr. Fristoe's memory was better than Mr. Guy's, and this court can not undertake to pass upon the credibility of the witnesses.

If the court accepted Mr. Fristoe's account of that conversation this was an additional construction by the two men who made the contract of what they meant by it.

The first case cited by appellant is Laclede Construction Company v. Tudor Iron Works, 169 Mo. 137. In that case the contract obligated the defendant to

furnish sufficient track fastenings for such rails as the plaintiff might buy or lay up to the amount of 39,000 tons of 75 lb. rails during the year 1899, and this court held that as plaintiff neither bought nor laid any such rails defendant was not bound to furnish any such fastenings. In that case the Tudor Iron Works made the proposition on December 9, 1898, to furnish said fastenings to this same plaintiff.

Under this arrangement plaintiff ordered and defendant delivered to plaintiff 10,000 pounds of splices on January 18, 1899. Nothing else was done until June 27, 1899, when plaintiff demanded all of the splices covered by the contract except the 10,000 pounds. The defendant refused to deliver the splices and suit was brought. It appeared that plaintiff had *not bought or laid any rails,* and this court ruled that as plaintiff had not bought or laid any rails defendant was not bound to furnish any fastenings until plaintiffs had first bought or laid such rails, and then only sufficient fastenings to lay such as plaintiff had bought or laid.

While the contract in that case was held to be mutual, the decision evidently rests upon the obligation which was imposed on the plaintiff to buy its fastenings for such rails as it might buy or lay in 1899 of defendant and defendant was bound to furnish the same, thus making that mutuality essential to the contract.

So in this case, if plaintiff had built the extensions for the St. Louis, Peoria & Northern, the defendant would have been bound to furnish the ties it *needed* for such extensions, and if plaintiff had refused to purchase them of defendant, defendant could have maintained its action therefor, but as it built no extensions defendant was under no obligation to furnish ties for any other purpose or for plaintiff to sell to others for whom it was not building such extensions.

But it is said that the court erred in finding for defendant, because on October 20, 1899, Mr. Faithorn

demanded of defendant 2500 ties which plaintiff desired to use "on the line of the St. Louis, Peoria & Northern Railway," and asked to have them delivered on the contract. Outside of this demand there was not a scintilla of evidence that these 2500 ties were in good faith needed for any of the proposed extensions, and there is nothing to take this particular lot out of the general purposes for which defendant agreed to furnish the ties.

No extension on which they were needed was mentioned in the letter of demand, and no proof *aliunde* that they were in fact needed for such an extension or either of the extensions for which defendant was to furnish ties. We think the court in its second and third declarations of law fully and correctly covered the law of the case to be applied to the contract created by the evidence in the light of the surrounding circumstances.

The judgment is affirmed. *Fox, J.*, concurs; *Burgess, J.*, absent.